**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**MICHAEL P.,** [1]

**Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

**Case No. 1:25 CV 15179**
**Magistrate Judge Cheryl L. Pollak**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Michael P. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying Plaintiff's application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.
[2] Frank Bisignano, the Commissioner of Social Security, is substituted as Defendant in his official capacity.

## I. PROCEDURAL HISTORY

On February 26, 2018, Plaintiff protectively filed an application for a period of disability and disability insurance benefits, alleging that he had been disabled since an alleged onset date of May 18, 2017. R. 79, 92, 203-04. Plaintiff's application was denied initially on April 5, 2018, and upon reconsideration on August 14, 2018. R.110–14, 117–19. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). R. 120-21. ALJ Frederick Timm held a hearing on January 13, 2020, at which Plaintiff, who was represented by counsel, testified. R. 56-78. Following the hearing, the ALJ sent interrogatories to an impartial vocational expert, Gary C. Young. R. 333-338. Based on the responses, a supplemental hearing was requested and held telephonically on July 1, 2020. R. 40-55. Plaintiff, who was represented by attorneys from the firm of Binder and Binder (the "Firm"), testified at the telephonic hearing, as did vocational expert, Young. R. 40-55.

In a partially favorable decision dated July 15, 2020, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act prior to June 1, 2020, but became disabled on that date and continued to be disabled through the date of the ALJ's decision. R. 17-39 ("the 2020 decision"). That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on December 1, 2020. R. 1-6.

Plaintiff timely filed an appeal to this Court, pursuant to 42 U.S.C. § 405(g), and on April 19, 2023, the Honorable Norah McCann King[3] issued an Order reversing and remanding the

[3] On June 9, 2021, Plaintiff consented to the disposition of the matter by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, *Michael P. v. Kilolo Kijakazi*, Dkt. No. 1:21-cv-1134 (ECF No. 9), and on June 14, 2021, the case was reassigned to the Honorable Norah McCann King, U.S.M.J., for all purposes. *Id.* (ECF No. 10). Following the filing of the instant matter on September 2, 2025, Plaintiff consented to the jurisdiction of the undersigned Magistrate Judge on July 8, 2026, *Michael P. v.*

decision for further consideration of Plaintiff's application limited to the alleged disability period from May 18, 2017, the alleged onset date, through May 31, 2020, the day before Plaintiff's disability began on June 1, 2020. R. 820-842; *see Michael P. v. Kilolo Kijakazi*, Dkt. No. 1:21-cv-1134 (ECF No. 21).

Thereafter, on October 25, 2023, the Appeals Council noted that the 2020 decision was "partially favorable, finding the claimant disabled as of June 1, 2020." R. 847. The Appeals Council vacated the unfavorable portion of the 2020 decision and remanded the case to an ALJ "for further proceedings consistent with the order of the court *for the period prior to June 1, 2020*." *Id*. (emphasis added). They Appeals Council further directed the ALJ to "offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision on the issue of disability *prior to June 1, 2020*." *Id*. (emphasis added).

A new hearing was held before ALJ Karen Shelton on May 2, 2024. R. 793-819. Plaintiff appeared at the hearing, represented by Samantha Xander, Esq., from the Firm, along with an impartial vocational expert, Steven Feinstein. *Id.* On June 26, 2024, the ALJ issued a decision, finding that Plaintiff was not disabled from May 18, 2017, through May 31, 2020. R. 764-792.[4] The Appeals Council declined review on July 11, 2025, R. 752-758, and this action was thereafter filed on September 2, 2025. ECF No. 1. The matter is now ripe for disposition.

---

*Commissioner of Soc. Sec.*, Dkt, No. 1:25-cv-15719 (ECF No.12), and the case was reassigned for all purposes on July 9, 2026. *Id.* (ECF No. 13).

[4] In her decision, the ALJ stated that Plaintiff was not disabled "from May 18, 2017, the alleged onset date, through December 31, 2022, the dated last insured," and that Plaintiff was "not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2022." R. 786. However, the ALJ's two references to December 31, 2022, appear to be a typographical error. "'In the context of social security cases, errors in ALJ decisions have been excused as mere scrivener's errors when the ALJ's intent was apparent.'" *Soto v. Bisignano*, No.

## II. LEGAL STANDARD

### A. Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this

---

1:25-cv-365, 2026 WL 751898, at *9 (M.D. Pa. Mar. 17, 2026) (quoting *Hudon v. Astrue*, Civil No. 10-cv-405-JL, 2011 WL 4382145, at *4 (D.N.H. Sept. 20, 2011)).

Here, throughout her decision, the ALJ reveals her intent to consider the relevant period prior to June 1, 2020, *i.e.*, May 18, 2017, the alleged onset date, through May 31, 2020, specifically referencing the directive by this Court and the Appeals Council. R. 767 ("Pursuant to the District Court remand order, the Appeals Council has directed the undersigned to consider the time period prior to June 1, 2020[], i.e., the time period from the alleged onset date of May 18, 2017 to May 31, 2020."); 770 (considering step three through May 31, 2020); 772 (crafting the RFC determination through May 31, 2020); 785 (finding Plaintiff was unable to perform his past relevant work through May 31, 2020, and that, at step five, finding through May 31, 2020, Plaintiff was able to perform other work that existed in significant numbers in the national economy).

Notably, as the ALJ acknowledged, R. 767, she is bound by the Appeals Council's order directing her to conduct proceedings "consistent with the order of the court for the period prior to June 1, 2020." R. 847; *see also* 20 C.F.R. § 404.977(b) (providing that the ALJ "*shall* take any action that is ordered by the Appeals Council and may take any additional action that is *not inconsistent* with the Appeals Council's remand order") (emphasis added).

Finally, the Court notes that neither Plaintiff nor the Commissioner construe the ALJ's decision as adjudicating any period other than May 18, 2017, the alleged onset date, through May 31, 2020. *See Plaintiff's Brief*, ECF No. 8 ("*Pl. Br.*") at 2 (noting that Judge King remanded the case for consideration of disability "limited to the period between May 18, 2017 and May 31, 2020" and that "[i]n a decision dated June 26, 2024, ALJ Shelton found [Plaintiff] not disabled between those dates"); *Defendant's Brief*, ECF No. 10 ("*D. Br.*") at 2 (stating that "the ALJ found Plaintiff was not disabled from his alleged onset date of May 18, 2017, through May 31, 2020, the end of the period at issue (Tr. 767-786)").

> Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting

*Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp. 3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp. 3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

**B. Sequential Evaluation Process**

The Social Security Act establishes a five-step sequential evaluation for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4), . "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b). If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f).

If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III. ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 51 years old at the alleged date of onset. R. 80, 93; *Pl. Br.* at 2. The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2022. R. 769. At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity during the period from May 18, 2017, his alleged onset date, through May 31, 2020. *Id.*[5]

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: depressive/bipolar/affective disorder and generalized anxiety disorder. *Id*. The ALJ also noted references in the record to suggest that Plaintiff was obese, but explained that there were no treatment notes concerning obesity and that the Plaintiff had advised at the hearing that he was

[5] The Court notes that there is a typographical error in the ALJ's decision, in that initially, the opinion states: "The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 18, 2017 through May 31, 2020 December 31, 2020 [sic] (20 CFR 404.1571 *et seq.*)." R. 769. Immediately following this sentence, the opinion states that "The record does not show earnings from May 17, 2017 through May 31, 2020." *Id.* (citations omitted). It appears from this later sentence that the ALJ meant for the period to run from May 17, 2017 to May 31, 2020, consistent with the earlier directives of Judge King and the Appeals Council. *See* n.4 *supra*.

only arguing limitations based on mental impairments. R. 770. The ALJ further noted that the record did not support a determination that Plaintiff's obesity caused more than minimal limitations and was non-severe but nevertheless was considered when assessing Plaintiff's RFC. *Id*.

At step three, the ALJ found that through May 31, 2020, Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart B, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). R. 770–72.

At step four, the ALJ found that through May 31, 2020, Plaintiff had the RFC to perform "a full range of work at all exertional levels," but with certain non-exertional limitations. R. 772–85. Citing the vocational expert's testimony, the ALJ further found that, through May 31, 2020, Plaintiff was unable to perform his past relevant work as an auto mechanic, a skilled position (SVP 7), performed at a medium level of exertion, given the RFC limiting Plaintiff to unskilled work. R. 785.

At step five, the ALJ concluded that through May 31, 2020, considering Plaintiff's age, education, work experience, and RFC, there were other jobs in significant numbers in the national economy that Plaintiff could have performed. R. 785–86. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from May 18, 2017, the alleged onset date, through May 31, 2020,[6] the day before Plaintiff became disabled on June 1, 2020. R. 786.

Plaintiff disagrees with the ALJ's findings at step four, arguing that the ALJ: 1) failed to

[6] As previously explained in n.5 *supra*, the ALJ's reference to December 31, 2020, instead of May 31, 2020, R. 786, was a typographical error.

properly evaluate the medical opinions in determining Plaintiff's RFC; and 2) failed to properly evaluate Plaintiff's testimony. *Pl. Br.* at 19-29; 29-32; *Plaintiff's Reply Brief*, ECF No. 11 ("*Pl.'s Reply*"). Plaintiff asks that the decision of the Commissioner be reversed and remanded solely for a calculation and award of benefits for the period May 18, 2017, through May 31, 2020. *Pl. Br.* at 32; *Pl.'s Reply* at 5. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *D. Br.*

## IV. THE RFC AND SUMMARY OF RELEVANT EVIDENCE

The ALJ found that through May 31, 2020, Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> [T]he claimant could never climb ladders/ropes/scaffolds; and should have avoided and have less that occasional exposure to extreme cold. The claimant was able to understand, remember and carry out simple, repetitive tasks, in a routine environment with few changes. The claimant was able to work for two-hours before needing a standard 15-minute break. The claimant was able to have frequent contact with supervisors and coworkers in proximity and have no contact with the public.

R. 772.

### A. Plaintiff's Testimony

In addressing the basis for Plaintiff's RFC, the ALJ began by noting that Plaintiff claimed disability due to bipolar disorder, anxiety, depression and psychosis. R. 773. She cited his testimony at the hearing in which he stated that he could not work from 2017 to 2020 due to severe OCD symptoms: "He just could not do it anymore. He could not do simple work because he would get distracted and could not stay focused." *Id.* He was unable to finish things and his memory was poor. *Id*. However, he could interact with others – "he did fine." *Id.* The ALJ noted

that his OCD was not as bad once the main stressors were no longer present. *Id.*

Among other stressors, the ALJ noted that Plaintiff's wife was dying, he was not working, and in May 2017, he was drinking so heavily after his wife's death that he checked into an inpatient facility. *Id.* He testified that he could not cope; it "was stressful watching his partner die," and he was in a "hopeless state," lacking in motivation and sleeping a lot -10 to 12 hours per day. *Id.* His OCD caused him to double-check everything he did, noting that it took him longer to do things, such as paying bills. *Id.* He testified that he had "racing thoughts" and anxiety, and he was hearing voices. *Id.* Although "medications helped," they "made him tired and he also gained weight." *Id.* He had "mania," which was controlled by medication, but which caused a lack of sleep, and he used post-it notes to prevent from forgetting things. *Id.*

The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, she found that his statements as to intensity, persistence, and limiting effects were not entirely consistent with the evidence in the record. *Id.*

**B. The Opinions of Mohammed Ashraf, M.D.**

In crafting the RFC, the ALJ also reviewed the opinion evidence of treating physician, Mohammed Ashraf, M.D., as set out in a medical source statement, dated January 13, 2018 ("January 2018 statement"), and in a second medical source statement, dated June 25, 2019. R. 781–82 ("June 2019 statement"). In the January 2018 statement, which was a five-page fill-in-the-blank, and check-the-box form, entitled "Psychiatric/Psychological Impairment Questionnaire," R. 665-69, Dr. Ashraf reviewed Plaintiff's treatment since May 18, 2017 for bipolar and generalized anxiety disorder. R. 665. He noted that he had most recently seen the Plaintiff on January 13, 2018, and he summarized Plaintiff's psychosocial factors. *Id*. He stated that "Patient feel[s] very depressed, sad and anxious. He has frequent mood lability and racing

thoughts. He feels tired most of the time and lying on the bed." *Id.* He noted that Plaintiff had been hospitalized for inpatient treatment from May 18, 2017, to July 18, 2017, and he expected Plaintiff's diagnoses and limitations would last at least 12 months. *Id.* The doctor denied that Plaintiff was a malingerer. *Id.*

In describing Plaintiff's various symptoms that supported his diagnosis, Dr. Ashraf checked boxes identifying the following:

- depressed mood;
- persistent or generalized anxiety;
- feelings of guilt or worthlessness;
- hostility or irritability;
- manic syndrome;
- other mood disturbances including psychotic thoughts;
- grandiose thoughts;
- illogical thinking;
- obsessions or compulsions;
- suicidal ideations, past suicide attempt;
- other oddities of thought, including auditory hallucination;
- difficulty thinking or concentrating;
- easy distractibility;
- flight of ideas;
- poor immediate memory;
- paranoia/suspiciousness;
- persistent irrational fears;
- vigilance and scanning;
- anhedonia/pervasive loss of interests;
- decreased energy;
- intense and unstable interpersonal relationships;
- pathological dependence, passivity, or aggressiveness;
- psychomotor abnormalities, including agitation;
- speech abnormalities, such as slowed speech;
- social withdrawal or isolation;
- delusions;
- disorientation to time and/or place;
- visual hallucinations;
- excessive sleep, sleeping more than usual, feels tired all the time.

R. 666.

When asked to identify the most frequent or severe symptoms, Dr. Ashraf wrote that Plaintiff "feels tired, depressed and withdrawn, no motivation to do anything. Hard to engage in any group activities. No interest in any activities." R. 667. The doctor noted that during Plaintiff's mental health examination, Plaintiff showed "poor attention and concentration. His energy level extremely low. He verbalized that he feels depressed and sad and [does] not want to engage in any activities." *Id.* Dr. Ashraf also noted that Plaintiff had experienced "episodes of decompensation or deterioration in a work setting that caused him to withdraw," and make "inappropriate remarks to his co-workers." *Id.*

- Using a scale of none (symptoms do not interfere with ability); mild (rarely interfere); moderate (occasionally interfere); moderate-to-marked (frequently interfere – one-third to two-thirds of an 8-hour day); and marked (constantly interfere – more than two-thirds of an 8-hour day), Dr. Ashraf estimated Plaintiff's ability to perform mental activities in a competitive environment for a sustained period of 8 hours a day, 5 days a week. R. 668. Based on this scale, the doctor determined that Plaintiff had marked limitations in the following areas: remembering locations/work like procedures;
- understanding/remembering one to two step instructions and detailed instructions;
- carrying out detailed instructions;
- maintaining attention/concentration for extended periods;
- sustaining an ordinary routine without supervision;
- working in coordination with/near others without being distracted;
- making simple work-related decisions;
- completing a workday without interruptions from psychological symptoms;
- interacting appropriately with the public;
- accepting instructions/responding appropriately to criticism from supervisors;
- getting along with coworkers/peers without distractions;
- maintain socially appropriate behavior;
- responding appropriately to workplace changes;
- being aware of hazards/taking precautions;
- setting realistic goals; and
- making plans independently.

*Id.* Dr. Ashraf also found moderate to marked limitations in carrying out simple one to two step instructions, performing activities within a schedule, and consistent punctuality; performing at a consistent pace without rest periods of unreasonable length/frequency; and traveling to

unfamiliar places/using public transportation. *Id.* He also found that Plaintiff would "likely be absent from work more than 3 times per month." R. 669.

Dr. Ashraf answered in the affirmative when asked if Plaintiff's symptoms and related limitations as detailed in the questionnaire applied as far back as May 18, 2017. *Id*. In response to whether the clinical and objective findings detailed in the questionnaire were reasonably consistent with Plaintiff's symptoms and functional limitations, Dr. Ashraf checked the box marked "Yes." *Id*.

Dr. Ashraf's June 2019 statement, was, like the January 2018 statement, a five-page form entitled "Psychiatric/Psychological Impairment Questionnaire," with fill-in-the-blanks and check-the boxes. R. 698-702. Dr. Ashraf, using the same scale as the one in the January 2018 opinion, found no marked limitations, but found moderate to marked limitations in Plaintiff's ability to: remember locations and work like procedures; understand/remember one to two step instructions and detailed instructions; maintain attention/concentration for extended periods; sustain an ordinary routine without supervision; work in coordination with/near other without distraction; make simple work related decisions; complete a workday without interruption from psychological symptoms; perform at a consistent pace without rest periods of unreasonable length or frequency; respond appropriately to workplace changes; be aware of hazards/taking appropriate precautions; set realistic goals; and make plans independently. R. 701. At the time this June 2019 statement was prepared, Dr. Ashraf had last examined Plaintiff three days earlier on June 22, 2019, and diagnosed him with bipolar I disorder, current episodes depressed, moderate. R. 698. In this 2019 statement , Dr. Ashraf described Plaintiff as "[r]emains depressed, sad and anxious[.] Feels tired most of the day with low energy and poor motivation. Feels hopeless and helpless. Denies having suicidal and homicidal thoughts." *Id.* In the form, the

doctor identified the signs and symptoms supporting his assessment and diagnosis by checking boxes indicating the following: depressed mood, persistent or generalized anxiety; abnormal affect, including constricted, irritable, labile, and inappropriate; feelings of guilt or worthlessness; irritability; manic syndrome; grandiose thoughts; illogical thinking; suicidal ideation; past suicide attempt; difficulty thinking or concentrating; easy distractibility; flight of ideas; loss of intellectual ability of 15 IQ points or more;[7] poor memory, including immediate, recent and remote; intrusive recollections of a traumatic experience; paranoia/suspiciousness; persistent irrational fears, anhedonia/pervasive loss of interests; appetite disturbances/weight change; change in personality; decreased energy; impulsive or damaging behavior; motor tension; pathological dependence; psychomotor abnormalities, agitation; speech abnormalities, slowed speech, delusions; disorientation to time and/or place; auditory hallucinations; loosening of associations; and excessive sleep. R. 699.

When asked to identify the most frequent or severe symptoms, Dr. Ashraf responded: "Irritable and depressed mood most of the time[,] remains isolated and withdrawn, reported frequently [sic] mood swings and racing thoughts." R. 700.

Dr. Ashraf found that Plaintiff would likely be absent from work more than three times per month. R. 702. Dr. Ashraf answered in the affirmative when asked if Plaintiff's symptoms and related limitations as detailed in the questionnaire applied as far back as May 18, 2017. *Id*. In response to whether the clinical and objective findings detailed in the questionnaire were reasonably consistent with Plaintiff's symptoms and functional limitations, Dr. Ashraf checked the box marked "Yes." *Id*.

**C. The Opinion of Lidia Abrams, Ph.D.**

[7] On the next page, Dr. Ashraf denied that Plaintiff had reduced intellectual functioning. R. 700.

The ALJ also reviewed the opinion of Lidia Abrams, Ph.D., a consultative examiner, who conducted a psychological examination on December 18, 2019. R. 740–50. R. 782–83. Dr. Abrams prepared a written clinical psychological report, R. 740–44, and a five-page check-the-box and fill-in-the-blank form, entitled "Psychiatric/Psychological Impairment Questionnaire." R. 746–50.

In the examination conducted by Dr. Abrams, Plaintiff described his history, indicating that he stopped working as a mechanic in May 2017 because "he felt himself deteriorating." R. 741. He told the doctor that he developed OCD, constantly checking his work and feeling like he was "slipping, making mistakes and could not risk someone getting hurt because of something he did wrong." *Id.* He stopped working and was hospitalized. *Id*. In May 1986, he had a motorcycle accident, with closed head injury and internal bleeding resulting in his remaining in a coma for 10 days. *Id.* After that, he slurred his words and required speech and cognitive rehabilitation. *Id.* He was out of work for 9 months, noting that "[e]verything felt overwhelming." *Id.* Even though he was able to return to work, he reported that his "head hasn't been right since." *Id.* After the accident, he developed psychiatric symptoms, requiring treatment and three additional hospitalizations, including a hospitalization in the spring of 2017 when he attempted suicide. *Id.* Eventually, he was diagnosed with bipolar disorder, with two episodes of mania. *Id.* He told Dr. Abrams that he had been taking medication for anxiety and bipolar depression since the accident. *Id.* He also reported several episodes of mania, with auditory hallucinations, where voices were telling him, "you're not doing it right, it's gonna fall apart," and one time he thought he saw the grim reaper. R. 742. He reported no longer feeling suicidal, because his wife was with him, and he reported taking lithium, Wellbutrin, and Zyprexa. *Id.*

Upon examination, Dr. Abrams noted that Plaintiff was "alert, fully oriented, cooperative

and forthcoming[,]" with a "slight odor about him." R. 743. Plaintiff reported that he showers every other day, but was "appropriately dressed." *Id.* He exhibited "some cognitive deficits when explaining timelines[,]" but "[o]therwise, his speech was normal," "linear and goal oriented," with no evidence of psychotic symptoms. R. 743–44.

Although Plaintiff indicated to Dr. Abrams that he had no problems with reading and writing, he claimed he could not do math like he used to. R. 743. The doctor described him as "nervous and unsure" when he arrived but became more comfortable as the examination proceeded. *Id.* Plaintiff reported that with medication, he no longer had mood swings but was "depressed a lot," and reported getting anxious sometimes[.]" R. 744. He reported sleeping a lot, doing chores at home, going to the post office and supermarket with his daughter's help, and driving to doctor's appointments, but with his wife's support. *Id*. He reported memory and concentration problems, watches tv and reads the paper sometimes, but he stated that he feels "like he's a machine without oil. His head gets locked up, seized up, and he can't function. He's been struggling for years. He does have good days and periods when he feels fine, especially if there is nothing to stress him out." *Id.*

During the examination, Dr. Abrams administered various tests. R. 742–43. On the Beck Depression Inventory, Plaintiff's composite score was in the moderate range and the Beck Anxiety Inventory showed a "high range of anxiety[.]" R. 743. In the Rotter's Incomplete Sentence Blank test,[8] Plaintiff wrote brief responses, some incomplete ones, and none contradicted his freely given statements. *Id*. His responses showed some instances of unusual spelling," which Dr. Abrams noted "may be related to brain damage." *Id.* Plaintiff also

---

[8] "This is a projective psychological test in which test-takers are asked to complete 40 sentence stems any way they choose. Responses of concern are further explored with the test-taker." *Id.*

underwent two subscales of the WASI test – Vocabulary and Block Design – scoring in the normal range on both. *Id.*

Dr. Abrams opined that Plaintiff was "most likely not up to working a full day productively and uninterrupted by symptoms of anxiety, confusion and stress." R. 744. She noted that medications kept Plaintiff "calm and steady as long as he is not asked to do anything challenging." *Id.* She noted that her evaluation of the Plaintiff was "clearly a challenge for him," describing him as "visibly nervous and unable to respond to some questions." *Id.* She concluded by stating that, based on her observations, the testing results and records she had reviewed, Plaintiff was "able to function normally for periods of time, but is highly unlikely to be able to hold down a full-time job and be gainfully employed." *Id.*

In response to the form questionnaire she was asked to complete, Dr. Abrams indicated that Plaintiff had marked limitations in his ability to perform activities within a schedule/consistently being punctual. R. 749. She further determined that he had marked to moderate limitations in remembering locations/work-like procedures; understanding/remembering/carrying out detailed instructions; maintaining attention/concentration for extended periods; sustaining an ordinary routine without supervision; making simple work related decisions; completing a workday without interruptions from psychological symptoms; performing at a consistent pace without rest periods of unreasonable length/frequency; adhering to basic standards of neatness; responding appropriately to workplace changes; and being aware of hazards/taking precautions. *Id.* Dr. Abrams further opined that it was likely that Plaintiff would miss more than 3 days of work per month. R. 750. Dr. Abrams responded in the affirmative when asked if it was her opinion that Plaintiff's symptoms and related limitations as detailed in the questionnaire apply as far back as May 18, 2017. *Id.*

### C. The Opinion of Christina Ryser, Ph.D.

The ALJ also reviewed the opinion of Christina Ryser, Ph.D., a consultative examiner, who conducted a psychological examination on July 24, 2023, R. 1016–20. R. 782. Dr. Ryser completed a five-page check-the-box and fill-in-the-blank form entitled "Psychiatric/Psychological Impairment Questionnaire." R. 1016–20. Dr. Ryser indicated that she did not administer formal cognitive testing as part of her examination. R. 1018.

Upon examination, Dr. Ryser noted that Plaintiff had been in an accident at age 20 that resulted in head trauma and that Plaintiff's course of treatment has been consistent with the signs and symptoms described in the questionnaire. R. 1016. She noted that Plaintiff's most frequent or severe signs and symptoms are "[l]ow mood/mood swings, intermittent irritability/anger, excessive worries, limited attention/concentration." R. 1018. She determined that Plaintiff had marked limitations in the areas of understanding/remembering/carrying out detailed instructions; maintaining attention/concentration for extended periods; performing activities within a schedule/being punctual; working in coordination with/near others without being distracted by them; completing a workday without interruption from psychological symptoms; performing at a consistent pace without rest periods of unreasonable length/frequency; accepting instructions/responding appropriately to criticism from supervisors; responding appropriately to workplace changes; and traveling to unfamiliar places/using public transportation. R. 1019. She also determined that he had moderate to marked limitations in the areas of remembering locations/work like procedures; sustaining an ordinary routine without supervision; interacting appropriately with the public; asking simple questions/requesting assistance; getting along with coworkers without distracting them; maintaining socially appropriate behavior; being aware of hazards/taking appropriate precautions; and making plans independently. *Id.* Dr. Ryser also

determined that Plaintiff would likely miss more than 3 days of work per month. R. 1020. Dr. Ryser responded in the affirmative when asked if it was her opinion that Plaintiff's symptoms and related limitations as detailed in the questionnaire apply as far back as May 18, 2017. *Id.*

## V. DISCUSSION

### A. Opinion Evidence and the RFC Determination

Plaintiff challenges the ALJ's consideration of multiple medical opinions, arguing that the ALJ failed to properly consider those opinions when crafting the RFC determination. *Pl. Br.* at 19–29. For the reasons that follow, this Court disagrees.

"Findings of fact by the [Commissioner] must be accepted as conclusive by a reviewing court if supported by substantial evidence." *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir. 1981). Substantial evidence has been defined as "such relevant evidence as a reasoning mind might accept as adequate to support a conclusion." *Id.* (citing *Lewis v. Califano*, 616 F.2 73, 76 (3d Cir. 1980); 42 U.S.C. § 405(g)). The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests," sufficient to enable a reviewing court "to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704-05. Specifically, the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence. *Id.* at 705-06. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) (holding that "Although we do not expect the ALJ to make reference to every relevant treatment note in a case. . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett*, 220

F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed after March 27, 2017,[9] the regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Instead, the Commissioner will consider the following factors when considering all medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating examination, the frequency of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5) other factors, including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c).

The regulations emphasize that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* § 404.1520c(a). As to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior

---

[9] As previously noted, Plaintiff's claim was filed on February 26, 2018.

administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

The applicable regulations further require the ALJ to articulate his or her "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 404.1520c(b). As previously noted, "[s]upportability and consistency are the most important factors. . . . ALJs need not explain their determinations regarding the other factors, but they must discuss supportability and consistency." *Gongon v. Kijakazi*, 676 F. Supp. 3d 383, 394 (E.D. Pa. 2023) (citations omitted); *see also Stamm v. Kijakazi*, 577 F. Supp. 3d 358, 370 (M.D. Pa. 2021) ("Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors, but if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors."). Finally, "a judge need not reiterate the magic words 'support' and 'consistent' for each doctor" in order to satisfy the articulation requirements for the supportability and consistency factors, providing that the judge "weave[s] supportability and consistency throughout her analysis of which doctors were persuasive." *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024).

At the administrative hearing stage, the administrative law judge is charged with determining the claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("the ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." (citations

omitted). A claimant's RFC is the most the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).

The ALJ has a duty to consider all the evidence when determining a claimant's RFC, *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), but need only include "credibly established" limitations in the RFC. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that is] supported by medical evidence, but is opposed by other evidence in the record."). However, '[t]his discretion is not unfettered." *Id.* While the ALJ has the discretion to include a limitation that is not supported by any medical evidence, "if the ALJ finds the impairment otherwise credible," "the ALJ cannot reject evidence of a limitation for an unsupported reason." *Id.*

"In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work." *Burnett*, 220 F.3d at 120. In conducting this analysis, the ALJ must: (1) "make specific findings of fact as to the claimant's residual functional capacity"; (2) "make findings of the physical and mental demands of the claimant's past relevant work"; and (3) compare the claimant's residual functional capacity to his past relevant work to determine whether claimant is capable of performing the past relevant work. *See id.* (citations omitted). "Similar to the medical reports, the ALJ must also consider and weigh all of the nonmedical evidence before him." *Id.* at 122 (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983); *Cotter*, 642 F.2d at 707). It is true that an ALJ is not required to discuss every tidbit of record evidence. *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). However, as previously explained, the ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to perform its statutory

function of judicial review." *Cotter*, 642 F.2d at 704–05.

In the present case, Plaintiff contends that in assessing the RFC, the ALJ erred in failing to properly evaluate the medical opinions as to Plaintiff's mental limitations. *Pl. Br.* at 19-29; *Pl.'s Reply.* The Court addresses these opinions in turn.

**1. Mohammad Ashraf, M.D.**

In her decision, the ALJ found that Plaintiff's treating psychiatrist Dr. Ashraf's findings of marked limitations and moderate to marked limitations are "not persuasive, as same are not consistent with the doctor's own treatment notes or the record as a whole." R. 782. In explaining this finding, the ALJ noted that the treatment records suggest that Plaintiff's "symptoms improved and stabilized after his hospitalization in May 2017, with no indication of additional hospitalizations or emergency care and stabilization of his manic symptoms as well as general stabilization of behavior which was noted to be uneventful." R. 781-82. The ALJ cited Dr. Ashraf's notes that Plaintiff maintained "intact speech and thought content with no psychosis," displayed "logical thinking, fair insight and judgment, full orientation and intact cognitive functioning, with intact memory and no attentional difficulties." R. 782. She also noted that Dr. Ashraf's first statement from January 13, 2018 was prepared only eight months after the Plaintiff's hospitalization and that subsequent notes suggested improvement and stabilization of symptoms. *Id.* The ALJ further noted that Dr. Ashraf "appears to acknowledge the claimant made progress," because compared to the first statement, the second statement in June 2019 did not indicate that there were any "marked" limitations, only "moderate to marked limitations." *Id.* The ALJ concluded that regardless, "even the moderate to marked designation is not supported by the record, as same shows improvement and stabilization of symptoms." *Id.*

**a. Supportability**

Plaintiff argues that the ALJ erred in finding that his treating psychiatrist's opinions were not persuasive. *Pl. Br.* at 20–29. Plaintiff first argues that the ALJ failed to provide any meaningful analysis of why Dr. Ashraf's opinions were unsupported. *Id.* at 20–21. This Court disagrees. The ALJ's decision reflects that she wove "supportability . . . throughout her analysis." *Zaborowski*, 115 F.4th at 639. The ALJ satisfied this requirement when she, for example, "reviewed the Doctor's treatment notes and found they did not support the Doctor's conclusion." *Tammy L.Z. v. Comm'r of Soc. Sec.*, Civ. No. 23-295, 2025 WL 1779229, at *2 (D.N.J. June 27, 2025).

As detailed above, the ALJ first reviewed Dr. Ashraf's records and then explained that Plaintiff's symptoms "improved and stabilized after his hospitalization in May 2017" with no indication that Plaintiff had any additional hospitalizations or emergency care. R. 781. The ALJ further explained that the evidence showed "stabilization of his manic symptoms with no recurrence of same," and that Plaintiff's behavior likewise stabilized. R. 781–82. The ALJ specifically pointed to Dr. Ashraf's treatment notes that reflected generally intact functioning, fair insight and judgment, and no attentional difficulties. R. 782.

Before reaching her conclusion, the ALJ detailed at length Plaintiff's medical history, including his admission for detoxification in May 2017, and carefully reviewed Dr. Ashraf's treatment history. R. 774–80. This detailed recitation reflects the severity of Plaintiff's symptoms at the time of hospitalization, as well as the subsequent stabilization and improvement of Plaintiff's symptoms, with generally normal findings over the course of multiple examinations. Specifically, the ALJ noted that upon Plaintiff's May 17, 2017 admission for alcohol detoxification, he reported "auditory and tactile hallucinations in the absence of alcohol use, with

mood swings, flight of ideas and difficulty controlling his thoughts." R. 774. At that time, Plaintiff also reported that he had thoughts of hurting himself. *Id.* The record reflected that he exhibited "tangential thought process, easy distractibility and racing thoughts[,]" along with "poor insight and . . . immatur[ity] in judgment." *Id.* His appearance was reported as "unkempt," and "he was uncooperative" and it was suggested that Plaintiff "was medicating with alcohol." *Id.* According to the record, he had been treated for bipolar disorder for the prior 20 years. *Id.* (citing Exs. 1F, 4F).

The ALJ also reviewed a treatment plan review on June 26, 2017, where it was determined that Plaintiff met the requirements for a continued stay for day/night partial hospitalization program. *Id.* Treatment notes from July 7, 2017, indicated that Plaintiff had difficulty identifying coping skills for stress, had "little to no insight regarding the impact of his behavior on others," had a history of impaired impulse control and inappropriate boundaries, including sexual and racist comments, low self-awareness, moderate anxiety, depression, negative thinking, sadness and impaired insight and judgment. *Id*. However, as the ALJ noted, the treatment notes indicated that Plaintiff's "motivation was good," and despite "some trouble understanding, concentrat[][ing] and remembering . . .[he] was able to function with services and assistance." *Id.* Citing the record, the ALJ noted that according to the mental status examination, Plaintiff had "appropriate appearance and was cooperative," but "impulsive, withdrawn, restless and intrusive", with an "anxious, depressed and very worried" mood. *Id.* "Thought process was tangential and orientation was overwhelmed. Speech was intact. Memory was fair to poor. Appetite and sleep were reported as good. Medication response was fair" and medication adjustments were made. *Id.* (citing Exs. 1F, 4F).

The ALJ reviewed the notes from July 13, 2017, upon Plaintiff's discharge from the hospital program, noting that Plaintiff demonstrated progress in decreasing his mental health symptoms through coping skills and psychotropic medication. *Id*. The discharge report also noted that Plaintiff had demonstrated motivation and willingness to make changes, developed health peer associations, and was motivated by the support network at the treatment center. *Id.* The report also noted that Plaintiff had unresolved issues including lack of impulse control, immaturity, and poor coping techniques. It was noted that he had problems with primary support, social environment, and a pending legal case involving sexual harassment at work and verbal aggression with a neighbor. R. 774-75 (citing Exs. 1F, 4F).

The ALJ also examined treatment notes from Dr. Ashraf, dated July 15, 2017, following Plaintiff's discharge from the hospital, indicating that Plaintiff no longer showed symptoms of "manic process," or decreased sleep, was no longer distractible, and no longer had elevated mood, irritability or excessive talking. R. 775. Plaintiff denied recent substance use, and he reported "stable and uneventful behavior[,]" with "good compliance with medication." *Id.* Plaintiff was described as friendly, attentive, relaxed, with normal speech, and mood and appropriate affect. *Id.* It was reported that there was no evidence of depression or mood elevation, and no evidence of hallucinations, delusions, bizarre behavior or other psychotic process. *Id.* The ALJ noted that according to Dr. Ashraf's notes, Plaintiff's

> [a]ssociations were intact and thinking was logical. Cognitive functioning and fund of knowledge were intact. Short-term and long-term memory was intact. He was able to perform abstractions and calculations. He was fully oriented. Vocabulary and fund of knowledge suggested cognitive functioning was in the normal range. Insight and judgment were fair. He did show signs of anxiety but there were no signs of hyperactive or attentional difficulties. There were no signs of withdrawal or intoxication.

*Id.* His medications were continued. *Id.*

The ALJ reviewed a follow-up appointment with Dr. Ashraf on August 12, 2017, at which Plaintiff indicated that Zoloft was not helping and Plaintiff wanted to go back on Wellbutrin. *Id.* Plaintiff denied manic process, increased physical activity, decreased sleep, distractibility, elevated mood, racing thoughts and excessive talking. *Id.* He reported normal energy levels, and stable and uneventful behavior was noted. *Id.* The ALJ noted that "Examination remained the same." *Id.*

Similarly, the ALJ noted that at a follow-up visit with Dr. Ashraf on August 19, 2017, the notes indicated that Plaintiff's "manic and mood symptoms were improving," that his physical activity was "more nearly normal," his sleep patterns had improved, his mood was less elevated, mood irritability had lessened, and his racing thoughts were less frequent and less intense. *Id.* Although the notes identified a number of prior symptoms, Plaintiff denied suicidal/homicidal ideations, was fully oriented, with fair insight and judgment. *Id*. Examination showed mildly elevated mood and hypomania. He presented as downcast and "was intrusive and had mood lability[,]" but his "affect was appropriate and there were no signs of psychosis. Associations were intact, thinking was logical and thought content appeared appropriate." *Id*. Plaintiff was "calm, friendly, attentive and relaxed with normal speech, intact language skills and intact cognitive functioning and fund of knowledge." *Id*. Plaintiff "showed signs of anxiety but no signs of hyperactivity or attentional difficulties. He was cooperative and attentive with no gross behavioral abnormalities." *Id.* (citing Ex. 2F).

The ALJ reviewed notes from a visit with Dr. Ashraf on September 9, 2017, where it was reported that Plaintiff's wife had advised that Plaintiff "remained in his room and was reluctant to come out." *Id.* Plaintiff reported feeling depressed and down, with "anergia, anhedonia and difficulty concentrating," although he denied suicidal ideations and reported "less acting out

behavior." *Id.* On examination, Plaintiff was found to be calm and friendly, although sad looking. *Id.* Plaintiff was "attentive, casually groomed and relaxed, although anxious[,]" with "normal" speech, "intact" thought content and language skills; his "[a]ffect was congruent to mood and verbal content," with logical thinking and cognitive functioning. *Id*. He "showed signs of moderate depression, with sad, glum demeanor and downcast. . . . Affect was congruent to mood and verbal content." *Id*. Dr. Ashraf noted Plaintiff's thinking was logical and his associations were intact, as were Plaintiff's fund of knowledge and short and long term memory. R. 775–76. Plaintiff was fully oriented and had fair insight and judgment with no gross behavioral abnormalities. R. 776.

The ALJ reviewed Dr. Ashraf's notes from October 7, 2017, citing Plaintiff's report of good sleep and appetite, with no complaints. R. 776. Dr. Ashraf noted Plaintiff was "less distractible," with less "[m]ood irritability," and "no longer . . .talking excessively." *Id.* Upon examination, Dr. Ashraf noted Plaintiff was calm, friendly, attentive, and relaxed. *Id*. His speech, language skills, and mood were described as "normal," and his thinking was "logical," and his cognitive functioning and fund of knowledge were appropriate and intact as was his short and long term memory. *Id.* Dr. Ashraf noted "no signs of psychosis," or "hyperactivity or attentional difficulties," and "no gross behavioral abnormalities." *Id.*

The ALJ further noted that on November 11, 2017, Dr. Ashraf reported that Plaintiff "was doing better and arrived by driving himself[,]" showed "no symptoms of manic process, had normal physical activity levels, improved sleep patterns, less elevated mood, improved energy level, lessened mood irritability, less frequent/less intense racing thoughts and decreased excessive talking." *Id.* Upon examination, Dr. Ashraf noted that Plaintiff was "calm, friendly and attentive, although tense and anxious." *Id*. Plaintiff's "[m]ood was moderately elevated and he

presented as manic, excited, although mood lability was observed." *Id.* Although there were "signs of anxiety," the notes indicated that there was "no hyperactivity or attentional difficulties," and "no gross behavioral abnormalities." *Id.*

The ALJ reviewed Dr. Ashraf's notes from a visit on January 13, 2018, where Plaintiff reported feeling depressed and sad because his wife was sick with cancer and in treatment: his mood "was mainly sad and depressed," with a "sad, glum demeanor." *Id.* Plaintiff "appeared downcast," but he denied suicidal ideations and Dr. Ashraf noted his behavior was "cooperative and attentive with no gross behavioral abnormalities." *Id.* As with earlier visits, Dr. Ashraf described Plaintiff's speech as "normal," with intact associations, thought content, cognitive functioning and short and long term memory. *Id.* There were "signs of anxiety but not hyperactivity or attentional difficulties." *Id.*

The ALJ noted that in a follow-up appointment with Dr. Ashraf on February 10, 2018, Plaintiff had reported good sleep and appetite, denied mood swings and racing thoughts, and appeared to be happy. *Id.* Dr. Ashraf reported "no signs of anxiety, hyperactivity or attentional difficulties." *Id*. Plaintiff was "calm, friendly, attentive and relaxed." *Id*. Plaintiff's speech, thought processes, thought content, and memory were intact as were his cognition and fund of knowledge. R. 776–77.

The ALJ noted that on April 7, 2018, Plaintiff reported good sleep and appetite, denied feeling depressed or sad, and Dr. Ashraf noted that his "mood swings and racing thoughts were well controlled with medications." R. 777. Plaintiff showed no symptoms of manic processing, was calm, friendly, attentive and relaxed; again, it was reported that "[h]e appeared happy." *Id.* Language skills, thought content, associations, and cognitive functioning were reported "intact," as were his short and long term memory. *Id.* There were "no signs of anxiety, hyperactivity or

attentional difficulties." *Id.* In June 2018, an examination again revealed normal findings and Plaintiff "reported everything was fine but he was concerned about his daughter who was recently diagnosed with bipolar." *Id.*

The ALJ reviewed Dr. Ashraf notes of July 21, 2018, in which he stated that Plaintiff "reported doing better." *Id.* On August 18, 2018, Plaintiff advised Dr. Ashraf that his wife was in treatment for cancer and his daughter was suffering with manic depressive illness. *Id.* He further advised that his sleep and appetite were good, and that there had been a "decrease in crying spells and feelings of worthlessness." *Id.* At the August 20, 2018, visit, Plaintiff reported he "was doing well but was having a lot of trouble with his wife, who was sick." *Id.* He reported no depressive symptoms and was "having less acting out, anergia, anger, anhedonia, excessive worrying, fatigue, irritability and feelings of worthlessness." *Id.* Notes from the December 15, 2018, visit indicate that Plaintiff denied feeling sad, depressed or anxious, with no signs of mania, and less frequent and less intense racing thoughts. *Id*. His behavior was "stable and uneventful." *Id*.

The ALJ noted that the "[e]xaminations during this time continued to show normal findings . . . no signs of anxiety, hyperactivity or attentional difficulties and cooperative/attentive behavior. He denied suicidal/homicidal ideations." *Id.*

The ALJ noted that Plaintiff continued to see Dr. Ashraf in 2019, citing notes from a visit on February 9, 2019, which indicated "reports of good sleep and appetite," "no evidence of a manic process," less irritability and fewer racing thoughts. *Id*. "Behavior was stable and uneventful." *Id*. Notes from April 6, 2019, indicated that Plaintiff's "mania and racing thoughts were well controlled with current medication regimen;" his depression was also "well controlled" and sleep had improved. *Id.* According to Dr. Ashraf, Plaintiff seemed less

distractible and his mood was less elevated. *Id*. There was no more grandiosity, irritability or talking excessively. *Id*. There was less anergia, anhedonia, crying spells, excessive worrying, and feelings of worthlessness. *Id*. "He was better able to concentrate. Behavior was stable and uneventful." *Id*. Examinations showed normal findings – "calm, cooperative, attentive, friendly, relaxed, happy, normal speech, intact language skills, normal mood, appropriate affect, intact though content with no psychosis, intact associations, logical thinking, intact cognitive functioning, appropriate fund of knowledge, able to perform abstraction and calculations, full orientation, no signs of anxiety, hyperactivity or attentional difficulties, fair judgment and cooperative/attentive behavior." R. 777–78.

The ALJ reviewed notes from June 1, 2019, where Plaintiff reported good sleep and appetite. R. 778. Dr. Ashraf noted that Plaintiff had had "no manic symptoms for a long time," and the examination "continued to show normal findings." *Id*. On June 22, 2019, Plaintiff reported some depression, but he denied suicidal ideations, his behavior "remained stable and uneventful[,]" and the examination continued to show normal findings, including "normal mood and affect." *Id.* At a follow-up examination with Dr. Ashraf on July 27, 2019, Plaintiff denied feeling depressed, sad, or anxious and he had no specific complaint. *Id.* Plaintiff's sleep and appetite were good and his behavior "remained stable and uneventful." *Id*. "Examination continued to show normal findings." *Id.* On September 21, 2019, Plaintiff had no specific complaints, his manic symptoms were controlled, and examinations again showed normal findings. *Id.* Notes from the November 16, 2019, visit indicate that he was "sleeping too much" so it was recommended that his medication be adjusted. *Id.* There were "no reports of manic symptoms," and "no signs of anxiety, hyperactivity or attentional difficulties and cooperative/attentive behavior." *Id*. Again, Dr. Ashraf noted that his "[e]xamination continued to

show normal findings[,]" including intact short and long term memory and ability to perform abstraction and calculations. *Id.*

The ALJ noted that Plaintiff continued to see Dr. Ashraf in 2020, with notes on January 11, 2020, indicating that he reported good sleep, but feeling tired in the morning. R. 779. There were no reported manic symptoms, less distractibility, less elevated mood, and no mood irritability. *Id.* Dr. Ashraf noted that Plaintiff's behavior was s "stable and uneventful" on the January 11, 2020 visit, as well as on the March 7, 2020, and May 2, 2020 visits. *Id.* Dr. Ashraf further noted on March 7, 2020, that Plaintiff was "doing well, but was sleeping a lot." *Id.* Plaintiff's mood was reported as stable and there were no racing thoughts, mood swings, and no manic symptoms. *Id*. The notes from the May 2, 2020 visit indicated that Plaintiff denied "feeling depressed, sad or anxious as well as racing thoughts, mood swings, and manic symptoms" and that the examination continued to show "normal findings" including normal speech, normal mood, normal cognitive functioning, with "fair insight and judgment, no signs of anxiety, hyperactivity or attentional difficulties and cooperative/attentive behavior." *Id.*

After a detailed review of the Plaintiff's record of treatment with Dr. Ashraf, the ALJ summarized the record, particularly Dr. Ashraf's treatment notes, by stating that "[o]verall, the record shows that while the claimant required hospitalization in May 2017, his symptoms stabilized thereafter with treatment and abstention from alcohol, with no indication of any additional hospitalizations or emergency care." *Id.* The ALJ highlighted Dr. Ashraf's treatment notes, which "consistently suggest no evidence of manic process with intact thought content with no psychosis, normal speech, logical thinking, normal cognitive functioning, intact memory, no attentional difficulties and fair insight and judgment." *Id.* The ALJ further highlighted that Plaintiff consistently denied suicidal ideations and was noted to be cooperative, attentive, calm,

and friendly, and that Plaintiff "acknowledged improvement in symptoms." R. 779–80. The ALJ specifically acknowledged that "[w]hile some examinations suggested fluctuations in mood and reports of difficulty with interpersonal relationships, it was also noted that [Plaintiff's] mood was stable and uneventful" and there was "no suggestion that [Plaintiff] had difficulty interacting with practitioners." R. 780. Finally, with respect to reports of "overwhelm and difficulty managing stress," the ALJ noted that the record "indicates that [Plaintiff] has shown improvement with treatment." *Id.*

In short, this evidence supports the ALJ's reasoning that, among other things, Plaintiff's symptoms improved and stabilized after his hospitalization in May 2017, with the notes reflecting, *inter alia*, generally intact cognitive functioning, short and long term memory, associations, and fund of knowledge as well as cooperative and attentive behavior and logical thinking with no hyperactivity or attentional difficulties. R. 774–82. In other words, the ALJ reasonably concluded that Dr. Ashraf's generally normal examinations did not support his opinions of, *inter alia*, marked and moderate-to-marked mental limitations and more than three absences from work a month. R. 665–69, 698–702, 774–82.

Having reviewed the ALJ's thorough review of the doctor's notes, the Court cannot find that the ALJ failed to properly consider the supportability of Dr. Ashraf's marked / moderate to marked opinions. *See* 20 C.F.R. § 404.1520c(c)(1); *Maxwell v. Kijakazi*, No. CV 22-4465, 2023 WL 3674335, at *4 (E.D. Pa. May 25, 2023) (finding that the ALJ's decision, including rejection of opinion evidence, was "free from legal error" where, *inter alia*, "the ALJ explained that Dr. Cespon's opinions were not well-supported by his own treatment notes, because he noted only a small number of psychiatric abnormalities during mental status examinations, found Plaintiff grossly normal on multiple occasions, and noted her to be doing well on multiple occasions").

Plaintiff nevertheless insists that it was error to reject Dr. Ashraf's opinions because Plaintiff "had some improvement and stabilization with treatment[.]" *Pl. Br.* at 25. Plaintiff specifically argues that, for people with mental disorders, the work environment differs from home or a mental health clinic and, therefore, "observations contained in a treating physician's notes that the claimant's condition is improved or 'stable and controlled with medication' do not contradict a finding of disability." *Id.* (quoting *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)).

Plaintiff's argument fails to persuade this Court that this matter requires remand. It is true that "stability does not equate to a specific medical condition. Indeed, someone can be stable with a chronic disabling malady or stable on a particular day or in a certain environment." *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 211 (3d Cir. 2019). Similarly, the fact that a claimant is "stable and well controlled with medication" does not necessarily show that a claimant is capable of returning to work. *Morales*, 225 F.3d at 319 (internal quotation marks omitted). In *Morales*, the Court explained that the ALJ should not reject a doctor's opinion based on "an inference gleaned from treatment records reporting on the claimant in an environment absent the stresses that accompany the work setting." *Id.* (advising further that an ALJ "should not substitute his [or her] lay opinion for the medical opinion of experts").

However, in this case, "[u]nlike in *Morales*[], upon which [Plaintiff] relies, the ALJ here did not inappropriately reject the treating physician's opinion on the basis of credibility judgments, speculation, or lay opinion." *Torres v. Barnhart*, 139 F. App'x 411, 415 (3d Cir. 2005). Instead, the ALJ in the present case based her assessment of Dr. Ashraf's opinion "on the objective medical evidence contained in the psychotherapy treatment notes," which was "not 'overwhelmed' by contrary evidence in the record." *Id.* (quoting *Morales* 225 F.3d at 320); *see*

*also* R. 774–82.

Similar to the instant action, the Court of Appeals for the Third Circuit in *Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114 (3d Cir. 2020), found that the ALJ was "entitled to discount" a treating source's earlier assessment "where it was undermined by the more 'detailed, longitudinal picture" provided by his later medical assessments." *Id.* at 121. Those later assessments revealed that the claimant was "consistently calm and cooperative upon exam, and her prognosis was 'good.'" *Id.* at 120. The Third Circuit in *Louis* further found that objective evidence supported the ALJ's finding that mental impairments did not prevent the claimant from engaging in substantial gainful activity where "she was consistently noted to be calm and cooperative, reportedly got along with immediate family, friends, and neighbors, could shop in stores by herself, attended community events, and had *consistently normal findings with her cognition, memory, speech, judgment and insight*." *Id.* at 121 (emphasis added).

Here, as noted by the ALJ, Dr. Ashraf's examinations – the "detailed, longitudinal picture" -- continued to report normal findings and stable behavior, which the ALJ found inconsistent with Dr. Ashraf's marked / moderate to marked opinions. Accordingly, the Court finds that the ALJ's conclusions are supported by Dr. Ashraf's treatment notes—which notes do not support his own opinions—and Plaintiff fails to persuade this Court that the ALJ erred when relying on Plaintiff's stability and improvement when discounting Dr. Ashraf's marked and moderate to marked opinions.

**b. Consistency**

The Court similarly finds that the ALJ properly considered the consistency of Dr. Ashraf's opinions when discounting those opinions. The ALJ specifically noted that Dr. Abrams' examination in December 2019, revealed that Plaintiff had coherent/connected thought

processes; linear/goal directed speech; no evidence of psychosis; and had fair insight and was alert, fully oriented, cooperative and forthcoming. R. 783. The ALJ noted that Plaintiff also acknowledged in that examination that he no longer had mood swings, although he felt depressed, and acknowledged that he had good days and periods when he feels fine, especially if nothing is stressing him out. R. 783. The ALJ noted that Plaintiff further reported on his ability to perform a variety of activities of daily living: Plaintiff does chores, including picking up after the dog, taking care of the yard and pitching in with housework; goes to the post office and the supermarket with his daughter; able to drive himself around; and he had friends and spent time with them sometimes. R. 784 (noting further that there was evidence Plaintiff was able to manage money).

A fair reading of the ALJ's discussion at step four demonstrates that she found Dr. Ashraf's marked and moderate to marked opinions inconsistent with the evidence. R. 781–83. Notably, the ALJ was not required to repeat this evidence in the paragraphs addressing Dr. Ashraf's opinions for the sake of elaborating on the consistency of those opinions. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) ("The ALJ, of course, need not employ particular 'magic' words: 'Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.' ") (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)); *Serrano v. Kijakazi*, No. CV 20-3985, 2021 WL 4477137, at *3–4 (E.D. Pa. Sept. 30, 2021) ("In this case, the ALJ discussed and analyzed the evidence extensively before determining the persuasiveness of the medical opinions. . . . The ALJ was not required to repeat this information for the sake of elaborating on her findings of persuasiveness."); *cf. Zaborowski*, 115 F.4th at 639.

Plaintiff nevertheless contends that the ALJ failed to consider the consistency between

the opinions of Dr. Ashraf, Dr. Abrams, and Dr. Ryser. *Pl. Br.* at 24–25, 28; *Pl.'s Reply* at 4. Plaintiff argues that these three doctors all found "significant limitations" in Plaintiff's ability to function in a work setting and that they "were consistent with each other's assessment." *Pl. Br.* at 24–25. The Court is not persuaded that this issue requires remand.

As an initial matter, "Plaintiff identifies no authority for the notion that an ALJ must specifically consider each medical opinion's consistency with every other in the record." *Abiodun O. v. Bisignano*, No. 25-CV-3585, 2026 WL 114261, at *7 (E.D. Pa. Jan. 15, 2026). In addition, 20 C.F.R. § 404.1520c(c)(2) "provides only that the ALJ must evaluate an opinion's consistency generally with the other 'evidence' in the record, including from medical sources as well as non-medical ones." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.620c(c)(2)).

Moreover, as previously explained, the ALJ appropriately discounted Dr. Ashraf's opinions and, for the reasons discussed below, the ALJ properly discounted the opinions of Dr. Abrams and Dr. Ryser. "'[T]he fact that medical opinions are consistent with each other does not, in and of itself, establish that any of the opinions were entitled to great weight or that the ALJ erred.'" *Robert O. v. Bisignano*, No. CV 23-2154, 2026 WL 1081146, at *8 (E.D. Pa. Apr. 21, 2026) (quoting *Hughes v. Kijakazi*, No. 21-367, 2022 WL 4103194, at *12 (W.D. Wis. Sep. 8, 2022)). In other words, the fact that there was some internal consistency between these opinions does not mandate that the ALJ must find these opinions persuasive where they are inconsistent with the record as a whole. *See Amanda L. v. Bisignano*, No. CV 24-08488, 2025 WL 1885962, at *7 (D.N.J. July 8, 2025) (rejecting claimant's argument that the ALJ failed to consider that the treating providers' opinions were consistent with each other); *Tomczak v. Kijakazi*, Civ. No. 21-14107, 2022 WL 2473441, at *11 (D.N.J. July 6, 2022) ("[A]lthough Dr. Buono's opinion may have been consistent with Dr. Sandler's opinion, the ALJ was not required

to find these opinions persuasive on that basis."). Accordingly, the ALJ's failure to expressly compare Dr. Ashraf's opinions with the opinions of Dr. Abrams and Dr. Ryser does not serve as a basis to remand this action.

**c. Absence of repeat psychiatric hospitalizations**

Plaintiff also complains that the fact that he did not require repeat psychiatric hospitalizations is not contrary to Dr. Ashraf's opinions. *Pl. Br.* at 25–26.[10] The Court does not find that the ALJ's reference to no additional hospitalizations undermines her decision to discount Dr. Ashraf's findings. That reference was made in the context of the ALJ highlighting Plaintiff's improvement and stabilization following his hospitalization in May 2017. R. 781–82. Moreover, no additional hospitalizations was only one factor the ALJ considered when finding that Plaintiff's mental condition improved and stabilized after May 2017. *Id*. (noting no recurrence of manic symptoms, uneventful behavior, intact speech, intact thought content with no psychosis, logical thinking, fair insight and judgment, full orientation and intact cognitive functioning, with intact memory and no attentional difficulties). Accordingly, as discussed

---

[10] To the extent that Plaintiff cites to cases that are outside of this circuit, that reliance is unavailing. *Pl. Br.* at 25–26 (citing, *inter alia*, *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015); Wiggins v. Colvin, No. 3:13CV1181, 2015 WL 5050144, at *3 (D. Conn. Aug. 25, 2015); Adkins v. Astrue, No. 3:09-CV-217, 2010 WL 3782388, at * 9 (N.D. Ind. Sept. 21, 2010)). The Third Circuit has previously noted that out-of-circuit cases are not binding in this circuit. *Camesi v. Univ. of Pittsburgh Med. Ctr*., 729 F.3d 239, 246 n.2 (3d Cir. 2013).

Moreover, as explained in more detail above, the ALJ in the present case appropriately relied on Plaintiff's stabilization and improvement—which included several factors, including the fact that Plaintiff had no additional hospitalizations after May 2017—when discounting Dr. Ashraf's opinions. R. 781–82. In other words, the ALJ did not speculate, as did the ALJ in *Voigt*, 781 F.3d at 876, that Plaintiff was not "capable of gainful employment" simply because he was not institutionalized. Similarly, the ALJ did not refer to the lack of additional hospitalizations for the proposition that an individual must be "psychiatric hospitalized" to be disabled, as Plaintiff cited in *Wiggins*, 2015 WL 5050144, at *3, or for the proposition that severe mental impairments necessarily, or even generally, result in hospitalization, as Plaintiff cited in *Adkins*, 2010 WL 3782388, at *9. Accordingly, Plaintiff's non-binding cited cases are inapposite.

above, the ALJ appropriately found that Plaintiff's treatment history following May 2017–which included, among other things, no psychiatric hospitalizations—reflected stabilization and improvement of Plaintiff's condition and provides substantial support for the ALJ's decision to discount Dr. Ashraf's marked and moderate to marked opinions.

**d. Plaintiff's signs and symptoms**

Plaintiff also argues that Dr. Ashraf "made clear" that his opinions were based on specific signs and symptoms, as detailed above. *Pl. Br.* at 21 (citing R. 666, 669, 699, 702); *see also Pl.'s Reply* at 1–4. According to Plaintiff, the ALJ "wholly ignore[ed]" Dr. Ashraf's explanations regarding Plaintiff's mental limitations. *Pl. Br.* at 22. Plaintiff fails to persuade this Court that this issue requires remand. While Plaintiff points to check-the-box answers reflecting Plaintiff's signs and symptoms in Dr. Ashraf's opinions, R. 666, 669, 699, 702, the ALJ's discussion of the evidence establishes why she appropriately found that those opinions were not supported by the physician's own treatment notes.

First, in his January 2018 opinion, Dr. Ashraf identified multiple signs and symptoms suffered by Plaintiff, including, *inter alia*, hostility or irritability; manic syndrome; psychotic thoughts; illogical thinking; auditory hallucinations; difficulty thinking or concentrating; easy distractibility; flight of ideas; poor memory; paranoia/suspiciousness; agitation; slowed speech; delusions; disorientation to time and/or place; and visual hallucinations. R. 666. However, Dr. Ashraf's treatment notes regarding the examination on January 13, 2018, reveal a different status. As detailed above, the ALJ noted that Dr. Ashraf indicated that Plaintiff denied suicidal ideation, was fully oriented, and presented as calm, friendly, cooperative, and attentive. R. 776. The ALJ further noted that Dr. Ashraf also indicated that Plaintiff had normal speech and logical thinking with intact short and long term memory, associations, thought content, and cognitive

functioning. *Id*. The ALJ also noted that Dr. Ashraf indicated that Plaintiff presented no hyperactivity or attentional difficulties; his judgment and insight were fair; his fund of knowledge was appropriate; and he had no gross behavioral abnormalities. *Id*. While the ALJ noted that Dr. Ashraf recorded that Plaintiff's mood was sad and depressed with a sad, glum demeanor and with low energy and sleeping a lot, Dr. Ashraf also noted that Plaintiff reported feeling depressed and sad concerning his wife who was sick with cancer and in treatment. *Id*.

Dr. Ashraf's examination on June 22, 2019, similarly conflicts with his June 2019 opinion, R. 698–702 (reflecting, *inter alia*, that three days prior to the opinion, Dr. Ashraf most recently examined Plaintiff on June 22, 2019). In that statement, Dr. Ashraf identified various signs and symptoms, including, *inter alia*, inappropriate and irritable affect; illogical thinking; difficulty thinking or concentrating; easy distractibility; flight of ideas; poor memory; paranoia/suspiciousness; persistent irrational fears; change in personality; impulsive and damaging behavior; agitation; slowed speech; delusions; disorientation to time and/or place; auditory hallucinations; and loosening associations. R. 699. However, the ALJ specifically noted that Dr. Ashraf's treatment notes dated June 22, 2019, reflect that Plaintiff's behavior remained stable and uneventful and that Plaintiff had denied suicidal ideations. R. 778. The ALJ noted that Dr. Ashraf's examination revealed that Plaintiff had a normal mood and affect. *Id*. While the ALJ noted that Plaintiff reported some depression, she also noted that Dr. Ashraf's examination continued to show normal findings. *Id*.

In short, the ALJ's discussion of Dr. Ashraf's opinions and treatment notes establish that, regardless of the signs and symptoms identified in his opinions, the ALJ found that the doctor's own treatment record did not support those opinions. R. 665–69, 698–702, 776, 778–80.

**e. Plaintiff's cited treatment records**

Plaintiff also contends that Dr. Ashraf's opinions are consistent with evidence in the treatment records reflecting depressed mood; persistent or generalized anxiety; feelings of guilt or worthlessness; irritability; manic syndrome; hallucinations; difficulty thinking or concentrating; poor memory; decreased energy; psychomotor abnormalities; withdrawal or isolation; and sleep disturbances. *Pl. Br.* at 23–24 (citing 368–69, 373, 379, 385–86, 390–91, 396, 401, 404–05, 449, 453, 455, 458, 465, 468, 709, 717). Plaintiff argues that the ALJ "erred by failing to consider the consistency of such findings" with Dr. Ashraf's opinions. *Id*. at 24.

The Court rejects Plaintiff's argument. As an initial matter, almost all of Plaintiff's cited pages are dated from May 2017—he was hospitalized on May 18, 2017—and a few months following that hospitalization. *See* R. 368–69 (June 9, 2017), 373 (June 12, 2017), 379 (May 22, 2017), 385–86 (June 21, 2017), 390–91 (May 27, 2017), 396 (July 7, 2017), 401 (May 18, 2017), 404–05 (May 18, 2017), 465 (August 12, 2017), 468 (July 15, 2017).[11] As detailed above, the ALJ explained how the records showed that Plaintiff's condition improved and stabilized after his May 2017 hospital admission. R. 776–80.

Moreover, as the ALJ's extensive recitation of the record evidence detailed above demonstrates, the ALJ did not fail to consider these findings, as Plaintiff suggests, *Pl. Br.* at 24. The ALJ expressly noted references in the record to instances of depression, anxiety; mania; hallucinations; difficulty thinking or concentrating; poor memory; decreased energy; psychomotor abnormalities; withdrawal or isolation; and sleep disturbances. R. 773–80. However, as already explained, the ALJ further noted how Plaintiff's symptoms and condition

[11] Of the five remaining page citations from September 9, 2017 (R. 458), October 7, 2017 (R. 455), November 11, 2017 (R. 453), January 13, 2018 (R. 449), 709 (June 22, 2019), and November 16, 2019 (R. 717), the ALJ expressly discussed Plaintiff's records on those dates. R. 775–76, 778.

improved and stabilized following his May 2017 hospitalization. *Id*. Plaintiff's insistence that his cited instances of symptoms warrant remand boils down to an invitation to the Court to reweigh the evidence, which the Court declines. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard].").

**f. Non-examining state agency reviewing consultants**

Plaintiff also contends that the ALJ's reliance "primarily" on reports provided by non-examining state agency medical consultants was error. *Pl. Br.* at 26–27; *Pl.'s Reply* at 4.

As background, Adrine McKenzie, Ph.D. conducted an initial review of Plaintiff's medical record on behalf of the state agency on April 3, 2018. R. 80–91 (Exhibit 2A). Mark Berkowitz, Psy.D. reviewed Plaintiff's medical record upon reconsideration for the state agency on August 7, 2018. R. 93–104 (Exhibit 4A). In her decision, the ALJ discussed the findings of Dr. McKenzie and Dr. Berkowitz, as follows:

> As for the findings of the DDS state agency, DDS determined the claimant was able to carry out simple and complex instructions and ask simple questions and work with supervisors and peers. (Exhibit 2A). On reconsideration, DDS determined the claimant was able to persist at tasks that can be learned in up to six months on the job; work in coordination with or proximity to others without being (unduly) distracted by them or exhibiting behavioral extremes; and interact periodically with the public. (Exhibit 4A).

The ALJ then referenced the DDS's determination in formulating the RFC, including in her RFC certain limitations identified by the DDS, stating:

> The undersigned also limits the claimant to simple/unskilled work, as suggested by DDS on reconsideration, due to mood dysregulation and difficulty managing stress/feelings of overwhelm. The undersigned also finds the claimant is limited in his ability to interact with the public but also finds the claimant would need to have reduced (although frequent) contact with supervisors and coworkers, due to mood dysregulation. The undersigned also finds the claimant would need to be limited to a routine work environment with few changes as well as be provided standard 15 minute breaks. Such limitations are needed to account for the claimant's difficulty

> managing stress, feelings of overwhelm and difficulty with managing changes. Ultimately, the DDS findings are partially persuasive.

R. 780–81.

In challenging the ALJ's consideration in this regard, Plaintiff complains that the initial state agency consultant, Dr. McKenzie, reviewed Plaintiff's file on April 3, 2018, and the state agency consultant upon reconsideration, Dr. Berkowitz, reviewed the file on August 7, 2018. *Pl. Br.* at 26–27; *Pl.'s Reply* at 4. Plaintiff complains that, in each instance, the state agency reviewing consultants did not review the treatment that occurred more than two years prior to the end of the period under consideration. *Pl. Br.* at 26–27 (arguing that the state agency record included treatment records only through February 2018).[12]

The Court rejects this argument as a basis for remand. State agency physicians are experts in Social Security disability programs. SSR 96-6p, 1996 WL 374180, at *1–2 (July 2, 1996). An ALJ may rely on the findings of a reviewing state agency consultant even where there is a lapse of time between the state agency report and the ALJ's decision: "The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler*, 667 F.3d at 361. "Only where 'additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing,' is an update to the report required." *Id.* (emphasis in original) (citations omitted). Stated differently, "there is no requirement that an ALJ must always receive an updated report from the

[12] Plaintiff is mistaken that the record reviewed by Dr. Berkowitz contained records only through February 2018. *Pl. Br.* at 27 (citing R. 101). The record reflects that Dr. Berkowitz reviewed records through July 3, 2018. R. 94–96 (listing under the heading "EVIDENCE OF RECORD" evidence received upon reconsideration dated as late as July 3, 2018). Similarly, Dr. McKenzie reviewed records through March 29, 2018. R. 81–92 (listing under the heading "EVIDENCE OF RECORD" evidence received upon initial review dated as late as March 29, 2018).

State medical experts whenever new medical evidence is available." *Wilson v. Astrue*, 331 F. App'x 917, 919 (3d Cir. 2009). Accordingly, in the present case, the ALJ did not err in finding the state agency medical consultants' opinions partially persuasive simply because there was a lapse in time between their opinions (issued in April and August 2018) and the end of the relevant time period (May 31, 2020). *Id*.

Notably, Plaintiff fails to explain how any specific medical evidence later submitted would result in a different mental RFC or an award of benefits. *See Pl. Br.* at 27; *Pl.'s Reply* at 4. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling caused harm." *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009). In this case, as set forth in detail above, the ALJ considered extensive medical evidence submitted after the state agency reviews and not only found no reason to seek an updated report but concluded that the later evidence supported Plaintiff's continued stability and improvement. Thus, the Court finds that Plaintiff has failed to meet his burden of showing harmful error.

In continuing to challenge the ALJ's consideration of the state agency reviewing opinions, Plaintiff also argues that "heavy reliance on the non-examining consultant[s] is contrary to the rule in the Third Circuit" for the last 40 years and that it is preferable to rely on treating or examining opinions. *Pl. Br*. at 27–28 (citing, *inter alia*, *Dorf v. Bowen*, 794 F.2d 896, 901–02 (3d Cir. 1986); *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986)). Plaintiff is mistaken. As this Court has already explained, state agency consultants are considered highly qualified experts. More to the point, since *Dorf* and *Brewster* were issued, the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources for claims such as Plaintiff's, filed in February 2018. *Compare* 20 C.F.R. § 404.1527

*with* 20 C.F.R. § 404.1520c(a). Of note, this Court has previously rejected a similar argument, *Spencer S. v. Comm'r of Soc. Sec.*, No. CV 24-3932 (RK), 2025 WL 914409, at *9 (D.N.J. Mar. 26, 2025) (finding no error in the ALJ's "determination that the state examiner opinions were more persuasive than the treating physician opinions" and rejecting the argument that "'heavy reliance on the non-examining consultants is contrary to the rule of the Third Circuit") (citations omitted). *See also Heather M. v. Dudek*, No. CV 23-2239, 2025 WL 834750, at *10 (E.D. Pa. Mar. 17, 2025) (noting that *Dorf* and *Brewster* "predate the revision to the governing regulations [20 C.F.R. § 416.920c(a)], which no longer focus on evidentiary weight nor allow deference to any medical opinion"). For these reasons, Plaintiff has failed to persuade this Court that remand is warranted based on the ALJ's consideration of the state agency opinions.

**g. Other regulatory factors**

Finally, Plaintiff complains that the ALJ failed to consider the other regulatory factors, including specialization as well as the length, frequency, and nature of the treatment. *Pl. Br.* at 28–29. Plaintiff argues that, in evaluating the opinions of Dr. Ashraf, the ALJ failed to consider that Dr. Ashraf was not only Plaintiff's treating physician but was a mental health specialist with a long-time treating relationship with Plaintiff. *See id.* This Court disagrees. For the reasons already discussed, the ALJ properly considered the supportability and consistency of Dr. Ashraf's opinions. R. 781–82; 20 C.F.R. § 404.1520c(c)(1)−(2). In addition, the ALJ specifically recognized Plaintiff's treating relationship with Dr. Ashraf and implicitly acknowledged the length of that relationship when detailing Plaintiff's lengthy treatment history with that provider. R. 775–782. Although the ALJ did not expressly discuss Dr. Ashraf's specialty in psychiatry, the ALJ specifically considered Dr. Ashraf's opinions that reflect, *inter alia*, that Dr. Ashraf is a clinical psychiatrist with a specialty in psychiatry/geriatric psychiatry. R. 665, 669, 702, 781–82.

In any event, any failure by the ALJ to expressly discuss Dr. Ashraf's specialty does not require remand where, as here, a comprehensive review of the record provides substantial support for the ALJ's evaluation of this treating provider's opinion. *See* 20 C.F.R. § 404.1520c(b)(2) (explaining that the factors of supportability and consistency "are the most important factors" and that an ALJ "may, but [is] not required to, explain how" he considered other regulatory factors, including relationship with the claimant, specialization, and other factors); *Jarrett v. Kijakazi*, No. CV 21-1607, 2021 WL 6136936, at *5 (E.D. Pa. Dec. 29, 2021) (finding that the ALJ "satisfied" his regulatory duties when he "explained that the treatment records were only partly consistent with and supportive of" the medical opinion because an ALJ "must only explicitly discuss the two most important factors: consistency and supportability").

For all these reasons, the ALJ's consideration of Dr. Ashraf's opinions enjoys substantial support in the record.

**2. Lidia Abrams, Ph.D. and Christina Ryser, Ph.D.**

Plaintiff also criticizes the ALJ's consideration of the opinions of Lidia Abrams, Ph.D. and Christina Ryser, Ph.D. *Pl. Br.* at 19–29. The ALJ found that the opinions of Dr. Abrams and Dr. Ryser were not persuasive, reasoning as follows:

> The undersigned does not find the record supports marked or moderate to marked limitations in any area of functioning. While the claimant required hospitalization in May 2017, the record shows the claimant's symptoms stabilized since that time, with no additional hospitalizations or emergency care. Treatment notes also indicate the claimant no longer presented with manic processes and had stable, uneventful behavior. Examinations also consistently indicate intact thought content with no psychosis, logical thinking, fair insight/judgment, normal speech and intact cognitive functioning, with intact memory and no attentional difficulties. While mood fluctuated at times with some depression and anxiety noted, the claimant was also described as calm, friendly, attentive and fully oriented. There was no suggestion the claimant was unable to interact with practitioners and no suggestion the claimant was confused, overly slow or unable to follow conversation or directions. It is also noted that examination with Dr. Abrams showed coherent/connected thought processes, linear/goal directed speech, no evidence of

> psychosis, fair insight and was alert, fully oriented, cooperative and forthcoming. The claimant also acknowledged he no longer had mood swings, although felt depressed, and acknowledged he had good days and periods when he feels fine, especially if nothing is stressing him out. Dr. Abrams also suggested the claimant mainly had difficulty when things were challenging (Exhibit 13F), suggesting the claimant's symptoms would not be exacerbated in a work environment with reduced stressors. While the findings of non-treating, examining practitioners Dr. Abrams and Dr. Ryser have been considered, they are not dispositive in light of years of treatment records suggesting stability of symptomatology, intact cognitive functioning, intact memory, intact attention, intact thought processes, intact thought content, full orientation and fair insight/judgment. Ultimately, the marked and marked/moderate limitations of Dr. Abrams and Dr. Abrams are not persuasive.

R. 783.

As with Dr. Ashraf, Plaintiff argues that the ALJ erred in relying on stabilization and improvement when finding Dr. Abrams' and Dr. Ryser's opinions "not persuasive." *Pl. Br.* at 20 (citing R. 783). For the reasons explained in detail above, the ALJ reasonably concluded that these opinions of, *inter alia*, marked and moderate-to marked mental limitations were implicitly inconsistent with Plaintiff's generally normal examinations—including intact cognitive functioning and memory and no attentional difficulties—since his hospitalization in May 2017. R. 740–44, 746–50, 774–82, 1016–20; *see also Zaborowski v. Comm'r of Soc. Sec*., 115 F.4th 637, 639 (3d Cir. 2024) (stating that "a[n administrative law] judge need not reiterate the magic words 'support' and 'consistent' for each doctor" in order to satisfy the articulation requirements for the supportability and consistency factors); *Koletar v. Kijakazi*, No. 1:21-CV-994, 2022 WL 3598090, at *13 (M.D. Pa. Aug. 23, 2022) (concluding that substantial evidence supported the ALJ's finding that a medical opinion was not persuasive because "the examination findings of the longitudinal record are not consistent with these rather extreme limitations") (internal quotation marks omitted).

Plaintiff nevertheless argues (as he did with Dr. Ashraf) that the ALJ failed to consider that the opinions of Dr. Abrams, Dr. Ryser, and Dr. Ashraf were consistent with each other. *Pl.*

*Br.* at 24–25, 28; *Pl.'s Reply* at 4. As the Court has already explained, this argument is unavailing: the fact that these examiners may have shared some consistency in opined limitations does not warrant a finding they were persuasive or otherwise establish that the ALJ committed reversible error—particularly when the marked and moderate to marked limitations were all inconsistent with the record evidence and generally unremarkable examination findings. *See Robert O.*, 2026 WL 1081146, at *8; *Amanda L.*, 2025 WL 1885962, at *7; *Tomczak*, 2022 WL 2473441, at *11. Accordingly, Plaintiff has not shown that the ALJ erred when finding that these examiners' opinions were not consistent with the record evidence.

Plaintiff further argues that the ALJ failed to provide any meaningful analysis of why the explanations of Dr. Abrams and Dr. Ryser were insufficient to support their assessments of Plaintiff's mental functioning. *Pl. Br.* at 20–21. First, as to Dr. Abrams, Plaintiff contends that this examiner supported her opinions with findings of a depressed mood; persistent or generalized anxiety; a constricted affect; feelings of guilt or worthlessness; manic syndrome; obsessions or compulsions; suicidal ideation with past suicide attempt(s); difficulty thinking or concentrating; poor memory; anhedonia/pervasive loss of interests; appetite disturbances/weight change; change in personality; decreased energy; motor tension; and sleep disturbances. *Pl. Br.* at 21 (citing R. 747, 750).

The Court disagrees that this issue requires remand. As detailed above, the ALJ expressly noted that Dr. Abrams' examination revealed that Plaintiff had coherent/connected thought processes; linear/goal directed speech; no evidence of psychosis; had fair insight; and was alert, fully oriented, cooperative, and forthcoming. R. 783. While the ALJ did not specifically say that this evidence did not support Dr. Abrams' findings, the ALJ was not required to use any "magic words" when considering the persuasiveness of this examiner's opinions. *See Zaborowski*, 115

F.4th at 639; *Pipkin v. Kijakazi*, No. CV 22-2-E, 2023 WL 411291, at *1 (W.D. Pa. Jan. 25, 2023) ("'[S]upportability relates to the extent to which a medical source has articulated support for the medical source's own opinion[.]'") (quoting *Cook v. Comm'r of Soc. Sec.*, No. 6:20-CV-1197, 2021 WL 1565832, at *3 (M.D. Fla. Apr. 6, 2021)).

While Plaintiff argues that Dr. Abrams' examination findings conflicted with the symptoms highlighted by Plaintiff, *Pl. Br.* at 21 (citing R. 747, 750), it was appropriate for the ALJ to resolve that inconsistency when she implicitly rejected those highlighted symptoms. *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Moreover, as previously noted, it is not the role of this Court to reweigh the evidence or reach its own factual determination. *See id.*; *Chandler*, 667 F.3d at 359.

Next, as to the supportability of Dr. Ryser's opinion, Plaintiff contends that this examiner based her findings on Plaintiff's depressed mood; persistent or generalized anxiety; an irritable and labile affect; feelings of guilt or worthlessness; hostility or irritability; grandiose thinking; suicidal ideation in the past with past suicide attempt(s); difficulty thinking or concentrating; easy distractibility; flight of ideas; anhedonia/pervasive loss of interests; appetite disturbances/weight change; decreased energy; impulsive or damaging behavior; motor tension; psychomotor abnormalities; pressured speech; social withdrawal or isolation; disorientation to time and/or place; past hallucinations; and sleep disturbances. *Pl. Br.* at 21–22 (citing R. 1017, 1020). While the ALJ did not expressly discuss all these signs and symptoms, she specifically noted, *inter alia*, that Dr. Ryser did not perform formal cognitive testing during the examination to support that examiner's marked and moderate to marked limitations. R. 782; *cf.* 20 C.F.R. §

404.1520c(c)(1); *Pipkin*, 2023 WL 411291, at *1. Moreover, although Dr. Ryser answered in the affirmative that Plaintiff's symptoms and related limitations she found on July 24, 2023, applied as far back as May 18, 2017, R. 1020, the ALJ specifically highlighted that the opinions of Dr. Ryser, and Dr. Abrams were "not dispositive in light of years of treatment records suggesting stability of symptomatology, intact cognitive functioning, intact memory, intact attention, intact thought processes, intact thought content, full orientation and fair insight/judgment." R. 783. In other words, fairly reading her decision as a whole, the ALJ's detailed recitation of the medical evidence above establishes that, contrary to Dr. Ryser's finding, Plaintiff's condition during the relevant period ending May 31, 2020, had in fact, improved and stabilized. R. 774–79; *cf. Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014) (finding that a medical report that does not address the claimant's condition during the relevant period has "little, if any, relevance to whether [the claimant] was disabled during that time").

Finally, to the extent that Plaintiff contends that the ALJ's consideration of the opinions of Dr. Abrams and Dr. Ryser were flawed because the ALJ did not mention that these examiners were mental health experts, *Pl. Br.* at 28–29, Plaintiff is mistaken. As an initial matter, the ALJ expressly noted these examiners' professional credentials. R. 782 (referring to "Christina Ryser, Ph.D., and Lidia Abrams, Ph.D."). Moreover, the examiners' opinions, which the ALJ reviewed, R. 782–83, identify their specialty as psychology. R. 750, 1020. In any event, as set forth above, any failure by the ALJ to expressly discuss their specialty does not require remand where the ALJ's comprehensive review of the record provides substantial support for her consideration of these opinions. *See* 20 C.F.R. § 404.1520c(b)(2); *Jarrett*, 2021 WL 6136936, at *5.

Accordingly, based on this record, the Court concludes that the ALJ's consideration of the opinions of Dr. Abrams and Dr. Ryser enjoys substantial support in the record and does not

serve as a basis to remand this action.[13]

### B. Subjective Statements

Plaintiff also contends that the ALJ erred by failing to properly evaluate Plaintiff's subjective complaints. *Pl. Br.* at 29–32. For the reasons that follow, this Court disagrees.

"Subjective allegations of pain or other symptoms cannot alone establish a disability." *Miller v. Comm'r of Soc. Sec.*, 719 F. App'x 130, 134 (3d Cir. 2017) (citing 20 C.F.R. § 416.929(a)). Instead, objective medical evidence must corroborate a claimant's subjective complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20 C.F.R. § 404.1529(a)). Specifically, an ALJ must follow a two-step process in evaluating a claimant's subjective complaints. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

First, as noted in her decision, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* at *2; *see also* R. 19. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities[.]" SSR 16-3p, 2017 WL 5180304, at *2; *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or symptom and the extent to which it affects the ability to work] obviously requires the ALJ to

---

[13] In reaching this conclusion, the Court notes that Plaintiff's additional arguments regarding Dr. Ashraf's opinions addressed above—the failure to consider the consistency between the opinions of Dr. Ashraf, Dr. Abrams, and Dr. Ryser; the ALJ's observation that Plaintiff did not have repeat hospitalizations within the relevant period; the reliance on the opinions of the state agency reviewing consultants; and Plaintiff's belief that reliance on such consultants was "contrary to the rule in the Third Circuit—were also directed at the ALJ's consideration of the opinions of Dr. Abrams and Dr. Ryser, *Pl. Br.* at 21–28, and are unavailing for the reasons previously discussed.

determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)).

In conducting an evaluation of the intensity and persistence of pain and its impact on the ability to work, an ALJ must consider the objective medical evidence as well as other evidence relevant to a claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(3) (listing the following factors to consider: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate pain or other symptoms; treatment, other than medication, currently received or have received for relief of pain or other symptoms; any measures currently used or have used to relieve pain or other symptoms; and other factors concerning your functional limitations and restrictions due to pain or other symptoms). Finally, an "ALJ has wide discretion to weigh the claimant's subjective complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. § 416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.*, 186 F. App'x 280, 286 (3d Cir. 2006) ("[A] reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").

Here, the ALJ followed this two-step evaluation process. The ALJ specifically considered Plaintiff's subjective complaints. R. 773. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id*. As previously discussed, the ALJ detailed years of medical evidence and

record testimony to support her findings. R. 774–85. In the view of this Court, this record provides substantial support for the ALJ's decision to discount Plaintiff's subjective statements as inconsistent with the record evidence. *Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F. App'x at 286.

Plaintiff nevertheless argues that the ALJ "used the same flawed logic" when discounting his subjective complaints as was used in considering opinion evidence—improvement and stabilization—and contends that the ALJ improperly rejected the opinions of Dr. Ashraf, Dr. Abrams, and Dr. Ryser. *Pl. Br.* at 31. The Court rejects this challenge for the reasons previously discussed.

Plaintiff next complains that the ALJ committed reversible error to the extent that she rejected his subjective statements "solely because" those statements were not consistent with the available objective medical evidence. *Pl. Br.* at 31 (citing 20 C.F.R. § 404.1529; SSR 16-3p). Here, however, the ALJ did not discount Plaintiff's statements "solely because" of the objective medical evidence. As set forth above, the ALJ also considered other evidence, including Plaintiff's daily activities, R. 779 (performing chores, including picking up after the dog, taking care of the yard and pitching in with housework; going to the post office and the supermarket with his daughter; driving himself around; and having friends and spending time with them sometimes), 784 (listing same activities and noting there was evidence Plaintiff was able to manage money), as well as the type, dosage, compliance, and reported effectiveness of medication, R. 773–783. Based on this record, Plaintiff has not persuaded the Court that the ALJ improperly discounted his subjective statements solely because they were inconsistent with objective medical evidence. *See id.*; *see also Seyler v. Kijakazi*, No. 4:21-CV-581, 2022 WL 8288119, at *9 (M.D. Pa. June 24, 2022) (rejecting the claimant's allegation that the ALJ

considered “only” the “objective medical evidence” and not the “other evidence” when evaluating the claimant’s subjective statements where the ALJ “appropriately considered” other evidence such as daily activities and the type dosage, effectiveness of medication), *report and recommendation adopted*, No. CV 4:21-581, 2022 WL 4483826 (M.D. Pa. Sept. 27, 2022).

Finally, Plaintiff complains that he has “an honorable work history” and that it is “not the picture of an individual who has no desire to work or is exaggerating.” *Pl. Br.* at 32. The Court is not persuaded that this issue requires remand. The Third Circuit has upheld an ALJ’s evaluation of a claimant’s subjective complaints where the ALJ did not “explicitly discuss his years of uninterrupted employment[,]” but where the ALJ did explain why other evidence in the record belied the claimant’s subjective complaints. *Sanborn v. Comm’r of Soc. Sec.*, 613 F. App’x 171, 177 (3d Cir. 2015). Notably, nowhere in the ALJ’s decision does she suggest that Plaintiff is a malingerer. *See generally* R. 767–86. Finally, “work history is only one of many factors the ALJ may consider in assessing claimant’s credibility. . . . Work history is not dispositive of credibility and the question of credibility is left to the ALJ’s discretion after considering all of the relevant factors.” *Forcinito v. Comm’r of Soc. Sec.*, No. CIV. 12-6940, 2014 WL 252095, at *9 (D.N.J. Jan. 23, 2014) (citations omitted); *see also Mason v. Colvin*, No. 15-1861, 2015 WL 6739108, at *6 (D.N.J. Nov. 3, 2015) (“The list [of factors contained in 20 C.F.R. § 404.1529(c)] is not comprehensive, nor is it mandatory for ALJs to go through each factor on the list in their opinions.”) (citing 20 C.F.R. § 404.1529(c)(3)). Here, as noted above, the ALJ detailed why other record evidence undermined Plaintiff’s subjective complaints. R. 773–85. Ultimately, given that the ALJ followed the appropriate standard and explained her consideration of Plaintiff’s subjective statements, for this Court to reach a contrary result on this record would amount to an improper re-weighing of the evidence. *See Zirnsak*, 777 F.3d at 611 (stating that a

reviewing court "must not substitute [its] own judgment for that of the fact finder"); *Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations [under the substantial evidence standard].").

## VI. CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Date: November 5, 2026

*s/Cheryl L. Pollak*
CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE